UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN THE MATTER OF THE APPLICATION OF THE UNITED STATES OF AMERICA FOR A SEARCH WARRANT FOR A **BLACK *ZTE* CELLULAR PHONE,** CURRENTLY LOCATED AT THE UNITED STATES CAPITOL POLICE HEADQUARTERS IN WASHINGTON, D.C. | Misc. No. _____ |

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Christopher M. Desrosiers, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this Affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the property – one ZTE cellular telephone, hereinafter the "Device," – which is currently in law enforcement possession (119 D Street NE, Washington, DC 20510), further described in Attachment A, for the things described in Attachment B.

2.      I am a Special Agent (SA) with the United States Capitol Police (USCP), where I have served since February 2007.  I am currently assigned to the Investigations Division Threat Assessment Section.  My duties and responsibilities, among other things, include investigations into the stalking and harassment of Members of Congress.  I have attended the Criminal Investigator Training Program at the Federal Law Enforcement Training Center in Glynco, Georgia.  I have received training and gained experience in search and arrest warrant applications,

the executions of searches and seizures, computer crimes, computer evidence identification, computer evidence seizure and processing, and various other relevant training.  As a federal agent, I am authorized to investigate violations of laws of the United States, and as a law enforcement officer I am authorized to execute warrants issued under the authority of the United States.

3.       This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

1.       The property to be searched is a **BLACK *ZTE* CELLULAR PHONE**, hereinafter the "DEVICE."

2.       The DEVICE is currently located at **119 D STREET NE, WASHINGTON, DC 20510**.

## PROBABLE CAUSE

1.       On or about May 22, 2014, staff from the Washington, D.C. office of Congresswoman Kyrsten Sinema of Arizona contacted the United States Capitol Police (hereafter USCP) to report a series of social media messages (via Facebook), and telephone calls from OLAGUNJU.  Staff stated that in his communication, OLAGUNJU claimed to have a personal relationship with the Congresswoman.

2.       On or about August 26, 2014, the Congresswoman's staff contacted USCP to report that OLAGUNJU's contact had continued and increased in frequency since the original report. Staff reported that OLAGUNJU would express his love for the Congresswoman, reference their

future together, and express his desire to meet with the Congresswoman in person.  Staff reported over 95 contacts from OLAGUNJU from June 2, 2014 through August 24, 2014.

3.      On or about October 14, 2014, the Congresswoman's staff contacted USCP to report that OLAGUNJU had sent the Congresswoman's AZ campaign office a letter including flight information referencing OLAGUNJU travelling to AZ.

4.      On or about October 14, 2014, a USCP Agent made contact with OLAGUNJU via telephone to discuss OLAGUNJU's attempts at contact with the Congresswoman and his reasons for providing his flight information to the Congressional office and contributing to the Congresswoman's campaign.  OLAGUNJU stated that he wanted to help the Congresswoman and further stated he was a member of the Congresswoman's "team".  OLAGUNJU was told by the USCP Agent that his contact with the office was unwanted, and that he was not a member of the Congresswoman's "team".

5.      On or about January 16, 2015, OLAGUNJU posted the following message on the Congresswoman's Facebook page:

> "How are you doing this beautiful Day?  I will be in Washington next month and I would like to stop by and see your new and beautiful office.  If you don't mind.  Maybe we can have dinner together in a small diner if you want.  At least for the first time and go watch movie called "Sema" together.  If it is fine with you, please let me know.  Ok.  Amos"

6.      On or about January 20, 2015, OLAGUNJU posted the following message on the Congresswoman's Facebook page:

> "My only one, are you back in Washington?  Do you dress warm?  It is very cold.  I will be watching the president tomorrow by 9:00PM.  And I will see you too with the rest Congress.  Also by February we shall see each other facially.  How great shall it be, I can not wait to see your face.  I love you so dearly.  Good Night dear. Amos"

7.      On or about January 22, 2015, a USCP Agent made contact with OLAGUNJU via telephone and explained to OLAGUNJU that his messages to the Congresswoman were in appropriate and unwanted, and needed to cease.  The Agent further stated to OLAGUNJU that he would not be able to meet with the Congresswoman if he travelled to Washington, D.C. OLAGUNJU stated that he understood.

8.      On or about March 25, 2015, staff from the PHOENIX, AZ district office of the Congresswoman contacted USCP to report that OLAGUNJU had left the office three voicemail messages, stating that he was currently staying at a local hotel in AZ.  During one of the messages, OLAGUNJU provided a phone number for a hotel located in Phoenix, AZ.

9.      On or about March 26, 2015, the Congresswoman's staff reported to USCP that OLAGUNJU had sent an RSVP via Facebook for an event the Congresswoman was having on March 27, 2015, in Arcadia, AZ.

4

10.     On or about March 27, 2015, a USCP Agent again contacted OLAGUNJU via telephone and reiterated that OLAGUNJU's contacts were unwanted.

11.     On or about June 1, 2015, OLAGUNJU sent the following email to the Congresswoman via her press email account:

> My Love & My life.  Do you see my tape?  If so do you like it or not?  Please let me know.  This is June 1st_Am I coming this Month?  According to our plan.  I will never let you down or disappoint you; by the special grace of God Almighty [KS] my love; my life & my blonde, I love you with my heart and my soul.  I am waiting for your respond.  If you are still doubting, please let me know.  Ask me any question please thank your husband to be, Amos"

12.     On or about December 30, 2015, OLAGUNJU sent the Congresswoman an email stating that he had purchased a flight from New York, NY to Phoenix, AZ to see the Congresswoman.  USCP Agents contacted the City of New York Police Department (NYPD) who verified the flight arrangements and made contact with OLAGUNJU and subsequently arrested him for outstanding traffic offenses.

13.     On or about March 4, 2016, the Congresswoman obtained an injunction in the Chandler, AZ Municipal Court ordering that OLAGUNJU was to have no contact with KS.  The Injunction was served on OLAGUNJU by the Phoenix Police Department and was scheduled to expire a year after it was issued.

14.     On or about April 22, 2016, OLAGUNJU showed up at an event in Chandler, AZ, that the Congresswoman was attending.  Staff removed the Congresswoman from the event and contacted local police.  Local police arrested OLAGUNJU for violation of the injunction. OLAGUNJU was sentenced to 11 months' probation and was allowed to leave the state to return to NY with his brother.

15.     On or about May 1, 2017, after the expiration of the first protective order, the Congresswoman's staff reported that OLAGUNJU had made contact again with their office when he tried to sign up to be a volunteer.

16.     On or about July 6, 2017, the Congresswoman obtained a second injunction against OLAGUNJU in the City of Phoenix, AZ Municipal Court, again ordering that OLAGUNJU was to have no contact with KS.

17.     On or about July 9, 2017, I was present when members of the NYPD served OLAGUNJU with the 2017 injunction at his residence located in Brooklyn, NY.

18.     On or about July 25, 2017, the Congresswoman's staff reported to USCP that their campaign office had just received a package from OLAGUNJU which included a letter and a photocopy of the injunction order.  The letter mentioned a person named "Williams", which was an apparent reference to a USCP Special Agent who had previously made contact with the defendant.  In the letter, OLAGUNJU wrote the following:

> "Also last Sunday morning, some people know (sic) the front of our house, I
> went to open the door, it was the police officers from Williams "again".  I am

sending these copies to you, so you can read them, and let me know your thoughts before I say anything.  I don't want you to "call him".  This man Williams is in serious trouble with Almighty God, but please pretend you don't know or see anything.  The Bible says the "The Battle is for the Lord, he taught is fighting us, but not us, he is fighting the "Host of heaven, and Jesus Christ.  Let us see what will happen, maybe he can beat the Almighty God, "we shall see."  I want you to read them over."  I love you more than ever.  I am seriously in love with you.  Take care of my job, so I can travel to San Francisco and meet you there, and start my job."  My lovely partner, and my "WIFE".  Thanks.  Your's in love Amos."

19.    On or about August 24, 2017, the Congresswoman's staff reported to USCP that their campaign office had received another mailing from OLAGUNJU.  In the multi-page letter, OLAGUNJU wrote:

"Hi Darling love, Good day to you.  How are you doing in AZ you did not call me.  Why are you so far to me?  When will I see your face sitting by my side.  Why are you entangled yourself in many things, that's why you've know time for me, how can we plan our future together as one.  Many things you're doing yourself where is your phone call to me.  I enclose the building plans for you.  This is the house I am building for you in Ejigbo, near Ibadan, of (sic) State of Nigeria for you.  The night you agreed to be my my wife, telling me "your're

in love with me, that night I decided to build you a house, bought you a land and the house have started." (with the letter, OLAGUNJU included copies of what appear to be blueprints for a house)

20.     On or about September 11, 2017, the Congresswoman's staff reported to USCP that OLAGUNJU had sent the following Facebook message to the Congresswoman, via her Veterans for [KS] Facebook page:

"Darling, the wedding gown, I love that, It is so moderate, beautiful, I want you to have it, You'll have when I see you less than two weeks.  Love."

21.     On or about October 12, 2017, the Congresswoman's staff reported to USCP that their Washington, D.C. office had received a mailing from OLAGUNJU, which included a letter and a copy of the 2017 injunction.  The letter included the following statements:

"About us, we're determined to marry each other, nothing can change that or delay us for living together.  Two years ago, you told me to ship all my belongings to you which I did, before problems started with Williams and your staffs.  I told you before that I would be a father of your children taking good care of them, and you a great husband till the end of my life."

22.     On or about November 15, 2017, the Congresswoman's staff reported to USCP that OLAGUNJU contacted their Washington, D.C. office via telephone, and requested to speak with the Congresswoman.  The request was denied and the call was terminated.

23.     On or about January 12, 2018, staff from the Congresswoman's Washington, D.C. office contacted USCP to report that OLAGUNJU had arrived in-person at their office, and stated that he had a meeting with the Congresswoman.   USCP Officers responded to the office immediately, and OLAGUNJU was subsequently arrested for violating the injunction order.  I am aware that, prior to arrest, the arresting officer contacted authorities in Phoenix, AZ, and confirmed that the 2017 injunction remained in force.

24.     On or about January 12, 2018, at the time of arrest OLAGUNJU was in possession of the DEVICE within his personal property, which was held for safe keeping at USCP headquarters during prisoner processing.  The DEVICE was recovered by USCP Agents pursuant to a search warrant of that personal property on February 12, 2018, and placed into evidence.

25.     On or about January 12, 2018, OLAGUNJU stated to your affiant that on or about January 11, 2018, he and the Congresswoman exchanged emails for approximately 2 hours. OLAGUNJU further stated the Congresswoman told him to travel to Washington D.C. to train for a job with her office.   As stated above, OLAGUNJU has previously to mailed items to the Congresswoman, including blueprints for a proposed house overseas. Given OLAGUNJU's statements regarding the purpose of his travel, as well as his communication with the Congresswoman regarding job training for a position in the Congressional office and his history of mailings and phone calls to the Congresswoman, I submit that OLAGUNJU likely carried information in the DEVICE that would further detail his travel and prior contact with the Congresswoman.

26.     The DEVICE is currently in the lawful possession of the USCP and stored at 119 D Street N.E. Washington, D.C.

27.     On January 18, 2018, an indictment was returned charging OLAGUNJU with one count of stalking, in violation of 18 U.S.C. § 2261A(1)(B), and one count of interstate violation of a protection order, in violation of 18 U.S.C. § 2262(a)(1). This indictment is pending in case no. 1:18-cr-00011-JDB.

## TECHNICAL TERMS

28.     Based on my training and experience, and information acquired from other law enforcement officials with technical expertise, I know the terms described below have the following meanings or characteristics:

        a.      Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and

accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b.      Digital camera:  A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital cameras use a variety of fixed and removable storage media to store their recorded images.  Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader.  Removable storage media include various types of flash memory cards or miniature hard drives.  Most digital cameras also include a screen for viewing the stored images.  This storage media can contain any digital data, including data unrelated to photographs or videos.

c.      Portable media player:  A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files.  However, a portable media player can also store other digital data.  Some portable media players can use removable storage media.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can also store any digital data.  Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d.      GPS:  A GPS navigation device uses the Global Positioning System to display its current location.  It often contains records the locations where it has been.  Some GPS navigation devices can give a user driving or walking directions to another location.  These devices

can contain records of the addresses or locations involved in such navigation.  The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth.  Each satellite contains an extremely accurate clock.  Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers.  These signals are sent by radio, using specifications that are publicly available.  A GPS antenna on Earth can receive those signals.  When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.      PDA:  A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs.  Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail.  PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can store any digital data.  Most PDAs run computer software, giving them many of the same capabilities as personal computers.  For example, PDA users can work with word-processing documents, spreadsheets, and presentations.  PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f.      Internet: The Internet is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections

between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

29.     Based on my knowledge, training, and experience, I know that the DEVICE has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and/or PDA.  In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## COMPUTERS, ELECTRONIC/MAGNETIC STORAGE, AND FORENSIC ANALYSIS

30.     As described above and in Attachment B, this application seeks permission to search for evidence, fruits, contraband, instrumentalities, and information that might be found on the Device, in whatever form they are found.  One form in which such items might be found is data stored on one or more digital devices.  Such devices are defined above and include any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop computers, laptop computers, notebooks, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, USB flash drives, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.  Thus,

13

the warrant applied for would authorize the seizure of digital devices or, potentially, the copying of stored information, all under Rule 41(e)(2)(B).   Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit that, if digital devices are found on the DEVICE, there is probable cause to believe that the items described in Attachment B will be stored in the DEVICE(S) for at least the following reasons:

a.      Individuals who engage in the foregoing criminal activity, in the event that they change digital devices, will often "back up" or transfer files from their old digital devices to that of their new digital devices, so as not to lose data, including that described in the foregoing paragraph, which would be valuable in facilitating their criminal activity.

b.      Digital device files, or remnants of such files, can be recovered months or even many years after they have been downloaded onto the medium or device, deleted, or viewed via the Internet.   Electronic files downloaded to a digital device can be stored for years at little or no cost.   Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools.   When a person "deletes" a file on a digital device such as a home computer, a smart phone, or a memory card, the data contained in the file does not actually disappear; rather, that data remains on the storage medium and within the device unless and until it is overwritten by new data.   Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on the digital device that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space – for long periods

of time before they are overwritten.  In addition, a digital device's operating system may also keep

a record of deleted data in a "swap" or "recovery" file.  Similarly, files that have been viewed via

the Internet are automatically downloaded into a temporary Internet directory or "cache."  The

browser typically maintains a fixed amount of electronic storage medium space devoted to these

files, and the files are only overwritten as they are replaced with more recently viewed Internet

pages.  Thus, the ability to retrieve "residue" of an electronic file from a digital device depends

less on when the file was downloaded or viewed than on a particular user's operating system,

storage capacity, and computer, smart phone, or other digital device habits.

31.     As further described in Attachment B, this application seeks permission to locate

not only electronic evidence or information that might serve as direct evidence of the crimes

described in this affidavit, but also for forensic electronic evidence or information that establishes

how the digital device(s) were used, the purpose of their use, who used them (or did not), and

when.  Based on my knowledge, training, and experience, as well as information related to me by

agents and others involved in this investigation and in the forensic examination of digital devices,

I respectfully submit there is probable cause to believe that this forensic electronic evidence and

information will be in any of the DEVICE(S) at issue here because:

a.     Although some of the records called for by this warrant might be found in

the form of user-generated documents or records (such as word processing, picture, movie, or

texting files), digital devices can contain other forms of electronic evidence as well.  In particular,

records of how a digital device has been used, what it has been used for, who has used it, and who

has been responsible for creating or maintaining records, documents, programs, applications, and

materials contained on the digital device(s) are, as described further in the attachments, called for

by this warrant.  Those records will not always be found in digital data that is neatly segregable

from the hard drive, flash drive, memory card, or other electronic storage media image as a whole.

Digital data stored in the DEVICE(S), not currently associated with any file, can provide evidence

of a file that was once on the storage medium but has since been deleted or edited, or of a deleted

portion of a file (such as a paragraph that has been deleted from a word processing file).  Virtual

memory paging systems can leave digital data on a hard drive that show what tasks and processes

on a digital device were recently used.  Web browsers, e-mail programs, and chat programs often

store configuration data on a hard drive, flash drive, memory card, or memory chip that can reveal

information such as online nicknames and passwords.  Operating systems can record additional

data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the

times a computer, smart phone, or other digital device was in use.  Computer, smart phone, and

other digital device file systems can record data about the dates files were created and the sequence

in which they were created.  This data can be evidence of a crime, indicate the identity of the user

of the digital device, or point toward the existence of evidence in other locations.  Recovery of this

data requires specialized tools and a controlled laboratory environment, and also can require

substantial time.

        b.      Forensic evidence on a digital device can also indicate who has used or

controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of

occupancy" while executing a search warrant at a residence.  For example, registry information, configuration files, user profiles, e-mail, e-mail address books, "chat," instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the digital device at a relevant time, and potentially who did not.

        c.     A person with appropriate familiarity with how a digital device works can, after examining this forensic evidence in its proper context, draw conclusions about how such digital devices were used, the purpose of their use, who used them, and when.

        d.     The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a digital device that are necessary to draw an accurate conclusion is a dynamic process.  While it is possible to specify in advance the records to be sought, digital device evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on digital devices is evidence may depend on other information stored on the devices and the application of knowledge about how the devices behave.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

        e.     Further, in finding evidence of how a digital device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on the device.  For example, the presence or absence of counter-forensic programs,

anti-virus programs (and associated data), and malware may be relevant to establishing the user's intent and the identity of the user.

## METHODS TO BE USED TO SEARCH DIGITAL DEVICES

32.    Based on my knowledge, training, and experience, as well as information related to me by Agents and others involved in this investigation and in the forensic examination of digital devices, I know that:

a.    Searching digital devices can be an extremely technical process, often requiring specific expertise, specialized equipment, and substantial amounts of time, in part because there are so many types of digital devices and software programs in use today.  Digital devices – whether, for example, desktop computers, mobile devices, or portable storage devices – may be customized with a vast array of software applications, each generating a particular form of information or records and each often requiring unique forensic tools, techniques, and expertise. As a result, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched, and to obtain specialized hardware and software solutions to meet the needs of a particular forensic analysis.

b.    Digital data is particularly vulnerable to inadvertent or intentional modification or destruction.  Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data.  Recovery of "residue" of electronic

files from digital devices also requires specialized tools and often substantial time. As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is often essential to conducting a complete and accurate analysis of data stored on digital devices.

c.      Further, as discussed above, evidence of how a digital device has been used, the purposes for which it has been used, and who has used it, may be reflected in the absence of particular data on a digital device. For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device. Evidence of the absence of particular data or software on a digital device is not segregable from the digital device itself. Analysis of the digital device as a whole to demonstrate the absence of particular data or software requires specialized tools and a controlled laboratory environment, and can require substantial time.

d.      Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text. Digital device users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. Digital device users may encode communications or files, including substituting

19

innocuous terms for incriminating terms or deliberately misspelling words, thereby thwarting "keyword" search techniques and necessitating continuous modification of keyword terms. Moreover, certain file formats, like portable document format ("PDF"), do not lend themselves to keyword searches.  Some applications for computers, smart phones, and other digital devices, do not store data as searchable text; rather, the data is saved in a proprietary non-text format. Documents printed by a computer, even if the document was never saved to the hard drive, are recoverable by forensic examiners but not discoverable by keyword searches because the printed document is stored by the computer as a graphic image and not as text.  In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography."  For example, by using steganography a digital device user can conceal text in an image file that cannot be viewed when the image file is opened.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband or instrumentalities of a crime.

    e.  Analyzing the contents of mobile devices, including tablets, can be very labor intensive and also requires special technical skills, equipment, and software.  The large, and ever increasing, number and variety of available mobile device applications generate unique forms of data, in different formats, and user information, all of which present formidable and sometimes novel forensic challenges to investigators that cannot be anticipated before examination of the

device.  Additionally, most smart phones and other mobile devices require passwords for access. For example, even older iPhone 4 models, running IOS 7, deployed a type of sophisticated encryption known as "AES-256 encryption" to secure and encrypt the operating system and application data, which could only be bypassed with a numeric passcode.  Newer cell phones employ equally sophisticated encryption along with alpha-numeric passcodes, rendering most smart phones inaccessible without highly sophisticated forensic tools and techniques, or assistance from the phone manufacturer.  Mobile devices used by individuals engaged in criminal activity are often further protected and encrypted by one or more third party applications, of which there are many.  For example, one such mobile application, "Hide It Pro," disguises itself as an audio application, allows users to hide pictures and documents, and offers the same sophisticated AES-256 encryption for all data stored within the database in the mobile device.

    f.  Based on all of the foregoing, I respectfully submit that searching any digital device for the information, records, or evidence pursuant to this warrant may require a wide array of electronic data analysis techniques and may take weeks or months to complete.  Any pre-defined search protocol would only inevitably result in over- or under-inclusive searches, and misdirected time and effort, as forensic examiners encounter technological and user-created challenges, content, and software applications that cannot be anticipated in advance of the forensic examination of the devices.  In light of these difficulties, your affiant requests permission to use whatever data analysis techniques reasonably appear to be necessary to locate and retrieve digital information, records, or evidence within the scope of this warrant.

33.     The volume of data stored on many digital devices will typically be so large that it will be extremely impractical to search for data during the physical search of the Device.

a.     Therefore, in searching for information, records, or evidence, further described in Attachment B, law enforcement personnel executing this search warrant will employ the following procedures:

1.     Upon securing the DEVICE, law enforcement personnel will, consistent with Rule 41(e)(2)(B) of the Federal Rules of Criminal Procedure, seize any digital devices, within the scope of this warrant as defined above, deemed capable of containing the information, records, or evidence described in Attachment B and transport these items to an appropriate law enforcement laboratory or similar facility for review.  For all the reasons described above, it would not be feasible to conduct a complete, safe, and appropriate search of any such digital devices at the DEVICE.  The digital devices, and/or any digital images thereof created by law enforcement sometimes with the aid of a technical expert, in an appropriate setting, in aid of the examination and review, will be examined and reviewed in order to extract and seize the information, records, or evidence described in Attachment B.

2.     The analysis of the contents of the digital devices may entail any or all of various forensic techniques as circumstances warrant.  Such techniques may include, but shall not be limited to, surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files); conducting a file-by-file review by "opening,"

reviewing, or reading the images or first few "pages" of such files in order to determine their precise contents; "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; and performing electronic "keyword" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are related to the subject matter of the investigation.

       3.    In searching the digital devices, the forensic examiners may examine as much of the contents of the digital devices as deemed necessary to make a determination as to whether the contents fall within the items to be seized as set forth in Attachment B. In addition, the forensic examiners may search for and attempt to recover "deleted," "hidden," or encrypted data to determine whether the contents fall within the items to be seized as described in Attachment B. Any search techniques or protocols used in searching the contents of the seized digital devices will be specifically chosen to identify the specific items to be seized under this warrant.

## **AUTHORIZATION TO SEARCH AT ANY TIME OF THE DAY OR NIGHT**

    34.    In light of the foregoing information, and based on my training and experience, I submit that the ZTE cellular phone located in evidence at USCP Headquarters would contain data, electronic evidence and/or unique digital signatures which contain evidence of the crimes under investigation.

    35.    Law enforcement personnel will commence the execution of this search and seizure warrant upon the DEVICE during daytime hours (between 6:00 a.m. and 10:00 p.m.), as early as

23

practicable.  It is anticipated that law enforcement personnel will attempt to image or copy digital information from certain servers on the DEVICE, rather than remove those servers from the DEVICE.  Such onsite imaging or copying will minimize disruptions to the use of those servers.

36.     From my training and experience, I know that imaging or copying information from servers on the DEVICE can be substantially delayed by various factors which cannot be ascertained or sometimes even anticipated until the actual execution of the warrant.  There may, for example, be no system administrator available, willing, or able to assist law enforcement personnel to narrow the search by identifying the virtual or dedicated server(s) on the DEVICE, or the server folders, containing information within the scope of the warrant.  There may be terabytes or even petabytes of information to be copied.  The network architecture of the servers on the DEVICE or the configuration of the server hardware may affect and delay data transfer speeds. Data encryption and password protections may also significantly delay imaging or copying as law enforcement personnel seek to identify necessary passwords without which imaging or copying on the DEVICE would likely be unachievable.  Under some circumstances, data downloads can be interrupted by network or hardware malfunctions or other network or hardware attributes which often necessitates restarting the data downloads from the beginning.

**<u>CONCLUSION</u>**

37.     I submit that this affidavit supports probable cause for a warrant to search the

DEVICE described in Attachment A and to seize the items described in Attachment B.


Respectfully submitted,


_____
CHRISTOPHER DESROSIERS
Special Agent
United States Capitol Police

Subscribed and sworn to before me on March 6, 2018:


_____
UNITED STATES MAGISTRATE JUDGE